Okay, Jacobs v. JP Morgan Chase, Mr. Davis, good morning. Good morning, Your Honor. Michael Davis, Ben Cuney, Roy Watson. Court is here with me at counsel's desk. We're here on behalf of the relator, Buse Jacobs. JPMC's foreclosure practices violated the Fannie Mae and Freddie Mac services agreements. JPMC's certifications of compliance and failure to disclose its noncompliance were textbook violations of the False Claims Act because JPMC received federal funds to which it was not entitled. The district court's order granting the motion to dismiss must be reversed for two reasons. First, as acquired by this court's decision in Matheny, the First Amendment complaint alleges with particularity both the certifications made by JPMC as well as the foreclosure practices that rendered those certifications false statements. And second, JPMC did not establish the public disclosure bar at the motion to dismiss stage for really two reasons. One, JPMC has not established that this anonymous blogger was a disclosure from, quote, the news media as the statute requires. And two, the relator is an original source. His evidence of JPMC's efforts to cover up its noncompliance, which the district court acknowledged was new information, satisfied the materially-add standard. It established JPMC's intent and guilty knowledge, which is a key element of a False Claims Act violation. I welcome the court's questions. On the second issue, do you agree that these are substantially the same allegations from the blog post and what you're alleging in the lawsuit? No, Your Honor. Okay. The blog post alleged this, and this is what the district court determined, that during foreclosure proceedings, JPMC used rubber stamp signatures of former WAMU employees after WAMU ceased to exist, which, if true, would be endorsement fraud. The disclosure, the additional information that the relator brings, is JPMC's efforts to cover up its actions. So you have the underlying conduct, right, the use of the endorsement stamp, and then you have the relator's additional facts, which the court agreed were new allegations, which was their efforts to cover it up. So that is not the same. But even if it were the same, Your Honor, the additional allegation of JPMC's efforts to cover up its conduct would be material additions. I think the best case that we cited in our brief was the Tenth Circuit's decision in Reed. Reed involved a similar circumstance where you had an allegation of noncompliance with a federal program, certification of compliance, and you had the relator who presented evidence of the defendant's efforts to cover up its violations. And this is what the Tenth Circuit said. The Tenth Circuit reasoned that in False Claim Act cases, they often turn on the issue of scienter, right, guilty knowledge. Yet the government is never in a good position to have direct evidence of guilty knowledge. Thus, the relator's evidence of the efforts to cover up amplified the materiality of the underlying allegations. And in the Tenth Circuit's case and the Reed case, looking at the evidence of the cover up, the Tenth Circuit actually said that the relator's allegations of scienter made the court, quote, especially confident. And we think that same analysis applies to this case. Even if the court concludes that the two are different, right, that the allegations of the blog are different than what the relator has added, the court should, like the Tenth Circuit, be especially confident that the relator's additional information meets the materially added standard by virtue of the fact that his evidence of the cover up establishes guilty knowledge and scienter, which anyone who has ever investigated a fraud case or who has had the opportunity to prosecute a fraud case or defend a fraud case knows. It is the evidence of the cover up that is often the linchpin evidence, right? The cover up is often bigger than the underlying fraud. I want to ask you about the, excuse me, the 9B issue. You argued in your reply brief that it doesn't matter whether a particular false claim was shown, essentially, because the complaint alleges false certification, not presentment of fraudulent bills. But the very first paragraph of count one says J.P. Morgan knowingly presented or caused to be presented to the United States false or fraudulent claims for payment. In fact, in count one, you don't mention certification at all. So which is it? Respectfully, Your Honor, count one, the title is expressed false certification. The district court order also agreed that this was a false certification claim. To the extent the complaint may have other allegations, I do want to make sure the court understands. Count one is expressed false certification. The district court agreed with that, as does JPMC, as well as count two was implied false certification. In the argument on false certifications, you don't identify any dates of certifications, but that every single one was false. So the complaint does identify the false certifications. The complaint identifies that it's annual certifications, right? It's the annual certifications that are at issue. So approximately, this is what the complaint alleges. In March of 31 of each year, JPMC certified that it was in compliance with state law, the lender contract, and the servicing contract. This is paragraph 67, which lists those certifications that were in its annual certifications. So you have that. So those are the certifications. And those certifications are pled with particularity as this court, Matheny, required. So Matheny, I think, is our best case on this issue. In Matheny, you also had a failure to comply with a government program and false certifications of compliance. And in Matheny, this court held that the particularity requirement is really two pieces. One, the submission of the certifications, which here, that is alleged. In our reply brief, we have a nice little chart where we actually compare the certifications in Matheny to the certifications here to really establish that we meet that Matheny standard. And then secondly, this court in Matheny said that the circumstances that rendered those certifications must also be pled with particularity. And here, the complaint does that as well. It is the foreclosure practices, right? The Freddie Mac and Fannie Mae servicing agreements do not allow for the foreclosure practices that JPMC engaged. And the complaint details those foreclosure practices that violated the Fannie Mae and Freddie Mac agreement. For Exhibits 2 and 3 of the amended complaint, do they cross-reference? In other words, the loans that are listed on Exhibit 2, are they the same as the expenses and fees that were paid on Exhibit 3? Yes, Your Honor. So Exhibit 2, think of this as like a summary. And then what we did with Exhibit 3 is we went into even more details. And we really did that to make sure that we sort of satisfied what this court looked for in Uquilla. In footnote 13, again a false certification case, this court in Uquilla concluded that the evidence that the defendant had received federal funds during the same time period as his false certifications was sufficient to allege a false claims act. And in Uquilla, again footnote 13, in Uquilla they presented three examples of three students who had received federal funds. And that was enough to establish, sort of to close the loop. It's the false certification, the submission of the false statement, and then evidence that the government actually paid out funds. And that's what we really tried to accomplish with Exhibits 2 and 3. This is where the district court erred. The district court conducted a Clausen presentment analysis. A presentment analysis is your typical Medicaid fraud where someone submits a bill for a procedure that they didn't actually do. That's a presentment claim. Applied here, if the relator had alleged a presentment claim, the claim would have been when JPMC submitted a claim for HOA fees, for reimbursement for paying HOA fees, they didn't actually do that. That's not what we've alleged. We have not alleged that the individual payment claims were false. We've alleged a false certification claim under Matheny and Uquilla, which again requires that you allege the particularity, the certifications. We do that in paragraph 67. And then you allege the circumstances that render those certifications false or fraudulent. It just seems to me you're alleging, quote, that JPMorgan presented false claims for payment. So are you abandoning those claims as far as Rule 9b goes? It sounds to me like what you're saying is you don't have to plead with particularity because you've alleged these false certifications. But count 1, except for in the title, talks exclusively about presenting false claims for payment. Would you agree that Rule 9b applies to those claims? So if he presented a Klassen presentment analysis, then yes, that would apply. But I think, Your Honor, I think everyone who analyzed this case, including the district court, all understood that this was a false certification claim. And I would acknowledge, Your Honor, I see that I'm into my rebuttal. You can answer. You're not. You still got less than two minutes. Thank you, Your Honor. I was having a moment. Thank you. I believe the court's question is what was actually alleged. I think everyone understood in the district court proceeding that this was a false certification. If you look at the answer brief, the answer brief from JPMC analyzes or argues that we did not establish false certification. And I think it's very clear that that's what we're trying to allege. Obviously, if there needed to be better pleading, that could be done, Your Honor. But I think all of the parties involved, it's very clear that this is a false certification. That is what this case goes to. It's about false certification. I'll tell you, when I came in, I thought the public disclosure bar is your biggest problem. And I'll tell you, I mean, first of all, we've said that there's broad sweep here, that the public disclosure bar includes publicly available websites intended to disseminate information. So for me, at least, saying that it's a blog doesn't count just isn't going to cut it with me. That's just me. And then when I look at these blog articles, look, they say that they're all mentioning J.P. Morgan's alleged fraudulent stamping scheme and questioning the validity of the endorsements on Washington mutual loans. They even disclosed details related to Cynthia Riley, provided a photograph of one of her stamps, called the note endorsement fraudulent, gave details about how she had left her employment with Washington Mutual before a note was stamped. Before the lawsuit was filed, the blogs explicitly stated J.P. Morgan was, quote, with the Cynthia Riley endorsement stamp, end quote, as part of their foreclosure efforts. I mean, I'm looking at this. You can add details to contextualize it. That doesn't count. This looks like you've got a problem. I see my time has expired. You can take a minute. Yes, take a minute. Thank you. So this really comes from Osheroff, right? So this is, and Doug Pryor actually wrote this decision at Osheroff. And we asked for it to do this. One, first start with the text of the statute, right? The text of the statute says, quote, from the news media, right? From the news media. I'm going to look at Osheroff, and I'm going to follow it. And I think the court does not. Osheroff is distinguishable for several reasons. One, in Osheroff, you had a website from the defendant. So it's the defendant's disclosure, which I think gives an issue of reliability. It was the Medicaid company's website. Secondly, I would also suggest that the Osheroff's discussion about website is different. In the preceding paragraph, if you go to the preceding paragraph, this court concluded that the public disclosure bar was triggered because those same disclosures were in the Miami Herald. And this court concluded that newspaper articles clearly qualify as public disclosures. It then went on to also address this additional question of whether websites are. And didn't it say, maybe you're right, it's dicta, but I mean, it seemed like it was intentional dicta. I mean, it said publicly available websites count as news media, right? Let's understand, I think the court has to understand the implications of that, right? Because remember, Facebook pages are websites. TikTok pages are websites. Instagram is our website. And JPMC's argument, and I think the taking Osheroff any farther, basically says that anyone who has a website, a Facebook page, or Instagram, is a member of, quote, the news media. Where we all understand that the plain and ordinary meaning of the term, quote, the news media, refers to CNN, Fox News, the Birmingham News, the Atlanta Journal. Supreme Court said that the news media in this section has a broad sweep. The news media has a broad sweep. Yes, the news media. This is true, because in the 1980s, right, you . . . I think we understand your argument, okay? You've gone over, I've said no problem. You've saved some time. Let's hear from Mr. Martins. Good morning, Your Honor. May it please the Court, Matthew Martins for JPMorgan. I'd like to address the two questions that were raised, one about the nature of the claims here, and then also the public disclosure bar. So starting with the nature of the claims, Judge Pryor, I would just point to paragraph one of the complaint, which says JPMorgan, a servicer of mortgage-backed securities, submitted claims to the United States for servicing fees. The claims were false. So they have based the alleged falsity on the submission of claims for servicing fees. They also make allegations, as my colleague points out in paragraph 67, with regard to the certifications. But whether the certifications are false depends on whether or not you have an example of a mortgage that was false. It all comes back, in other words, just saying in paragraph 67 the annual certifications were false. And just parenthetically, I don't think there's anywhere near enough detail, even in paragraph 67, about what exactly was false and what particularly. But what they would have to allege in that circumstance is that a particular annual certification covered particular loans that were submitted to Fannie or Freddie for reimbursement. And then they would need to tell us that the loans covered by that annual certification were in some way fraudulently endorsed. They have nothing of that sort. They don't have to show that one loan for each period was fraudulently endorsed, wouldn't they? And they certainly alleged that there were more than one, that there were a  But if you look at the examples of the loans they have, they don't actually have any details about what happened with regard to any of those loans. If you go through that list of 40, that's Exhibit 1, they told us nothing other than that one particular note has a stamp on it. All of them stamped loans dated prior to J.P. Morgan taking over WAMU. They don't have any evidence of when those stamps were applied and that J.P. Morgan was in any way involved or had anything to do with it. The examples they give purportedly, and we can get into those, of the Queen Mohammed and John Riley cases that Mr. Jacobs handled the foreclosures for, were never alleged to have been submitted for Fannie or Freddie reimbursement. And so he talks about two loans that have nothing to do with Fannie or Freddie reimbursement. Then he lists a bunch of loans that have endorsements, but he tells us nothing about the circumstances of those endorsements on those particular loans. I'm confused by that argument because I thought that his allegations were just that all of these loans were endorsed through this fraudulent scheme. And so the exhibits were just to show, you know, as an example, these are some loans that I am alleging were endorsed through this fraudulent scheme. And there's a lot going on here, so maybe it's not as simple as that, but why isn't that enough? So there are certainly allegations in the complaint that make that broad statement, any note endorsed by Cynthia Riley was fraudulent. But he has to allege facts to support that broad assertion and that he doesn't have that detail. In fact, what's in the record is that one of those notes we know is a fact even at this stage that's not true. The judge took judicial notice of the fact. Yeah, but I'm just saying you could find out after litigation that none of it's true, right? And so that's, you know. Right, but he has to allege an example. He has to show what are the factual bases for making the sweeping allegation that every Cynthia Riley endorsement was false. What is the basis for saying that, that every single one was false? There's no details in there that would support the conclusion that every one was false. So offering that conclusory assertion without details to support it doesn't state a claim under 9B. Otherwise, someone could just come in and say every single one. Well, what's your basis for that? Well, I don't have an example of even a single one, but I'm here saying that every single one was. I mean, if you're going to claim every single one was fraudulently endorsed, certainly you should have to be able to show one example of one that was fraudulently endorsed and submitted to Fannie Mae, but there's no examples. Okay, so, and like I said, there's a lot going on here, so I may be wrong about, I guess I want to, when you're saying that there was an example that was proven to be not fraudulently endorsed, you're talking about the Aguilar or Aguiar mortgage note? Is that what you're talking about? That the judge took judicial notice of that was, and we know it was endorsed by Riley prior to J.P. Morgan taking over Wham-O, and that was listed as one of the 40. But my point ultimately isn't can we show one of his 40 identified mortgages wasn't fraudulent. He doesn't identify even a single one that was. There is no evidence about what happened with regard to any of those 40 loans. There's no evidence about who stamped it, when it was stamped. Well, when you say evidence, you mean allegations, right? Right. I should be more precise. Particularized allegations with regard to the details of any of those mortgages. He says, here's a bunch of mortgages stamped by Cynthia Riley, but what's the basis for saying that Cynthia Riley didn't in fact, that in particular, that J.P. Morgan had some involvement in stamping those? There's no such allegations in the complaint to satisfy that, to evidence that. If he's going to claim every single one was fraudulently endorsed, presumably he should at least be required to come up with one of his 40. In fact, he doesn't have a single one where he can tell us what happened with regard to that. If he had made this allegation, I just want to see if you think this would be sufficient. If he had said, this is what Cynthia Riley did with mortgage XYZ. I don't even know what the allegation would be. She affixed her stamp. Someone else affixed her stamp. She didn't exist anymore. She was not there anymore. Someone else used her own stamp and affixed it to fraudulently endorse it as if she had endorsed it, and that was mortgage XYZ. Then he had said, and that's the scheme that they had, and they did that with every mortgage. Would that be sufficient? No. Two things. His claim is that J.P. Morgan stamped the notes after it took over in 2008. There is no evidence, no particularized factual allegations of any single note that was submitted to Fannie Mae where that occurred. But to your question of if he had that, if he had an example of, here's one I can show you that J.P. Morgan stamped after that date, he would then need to have some particularized basis for saying that occurred in every case. You can't just pivot from I have one example to I'm just now going to assert everybody did it in every instance. So what I'm saying is he doesn't even have one example, much less a basis to say, and every single note was fraudulently endorsed by J.P. Morgan. With regard to the public disclosure bar, I think Osheroff answers this not only with regard to the issue of the Internet websites, which I think is just not a plausible argument under that theory. The First Amendment wouldn't apply to Internet. You can't look at what news media meant in 1986 and say it doesn't include the Internet. Osheroff is important because of that. I mean, there are a lot of what I would have considered the news media in an earlier era that were newspapers that don't even print newspapers anymore, and now they're entirely on the Internet, but they're the same source of information. But that's different from saying that everything on the Internet is news media. What are these blogs? Well, so they're attached as exhibits, and so one of them is entitled Victory Over Chase Blog Spot, and it has, as I think the Court noted, a detailed what reads like an article, a discussion of the supposed allegations against J.P. Morgan. Another one is MFI, which I think is MFI Miami, which I think is mortgage fraud something Miami that, again, has... Do we know anything like about how much traffic they get? Does that matter? There's no evidence of that, and there is no... Or who's writing these things, where this comes from, whether this is something that the public would know about? Well, I mean... Or would you have to know about them to search for them and find them? Do we know any of that? That's certainly not in the record, but nor was it in the record in Osharoff. What the Court said was, in that instance, it wasn't even something like a blog, which was purporting to tell the story. In that instance, it was the company's website that described its practices of paying particular... Giving gifts away to people who were getting medical services. In that instance, the Court said it was published on the company's website for purposes of informing the public. And on their face, these documents serve that same purpose. Yeah, I mean, just looking at them, I mean, I guess we don't have to necessarily say, in this case, rule in your favor, that like an individual's Facebook post or an individual's TikTok, you know, would count as news media. These websites look like they are, at the very least, they're covering the mortgage industry, right? MFI Miami, Mortgage Fraud Miami. I mean, they're covering this topic. Victory over Chase, over JPMorgan Chase. They're covering this topic for the public. And you see that on their face, recounting supposedly what they claim happened here. And as Chief Judge Pryor, you pointed out, they have all the relevant details, including family and friends, which is more than was present in Osharoff. In Osharoff, the company's website simply disclosed the fact that they were providing gifts to people who got medical services. They didn't go on and say, and we submit claims for those medical services to Medicare or Medicaid. And yet the court found that that core allegation, the core statement on the website of we provide gifts to people connected with medical services was enough to state the substance of the claim and to overcome the public disclosure bar. Here, there's actually references in the very first document. Victory over Chase, twice it says, we endorse and deliver loans to Fannie and Freddie. The bulk of our work was sold to Freddie and Fannie. So it actually goes further, much further, in identifying the connection to the government than did the website in Osharoff, which isn't alleged or isn't described as making any reference to the Medicare or Medicaid reimbursement that was sought. So the gist of the case is here, including the specifics that Chief Judge Pryor recited concerning Cynthia Riley, also Jessa Alonzo, one of the other people that's alleged in the complaint to have had her stamp misused. And so all the details are alleged in these blogs. And we believe that that satisfies the public disclosure bar, regardless of whether or not there was a specific particularized allegation made of any mortgage note fraudulently stamped by J.P. Morgan and submitted to Fannie or Freddie. And we respectfully submit there's not even a single example of a particularized allegation of that sort in this complaint. There's a list of mortgages with stamps, no allegation in a particularized way that someone at J.P. Morgan stamped them, who that was, and that the person who submitted the claims to Fannie or Freddie had any knowledge of that, and thus thus I enter. The submitted the claims aspect of it, I thought he made an interesting distinction, opposing counsel made an interesting distinction today, that this isn't a situation where you are submitting a claim for reimbursement for Medicaid that the argument is that you knew that you didn't perform that surgery. The fraud was not a claim specific fraud. It was a certification, an annual certification fraud. And then the submission of the claims, the only reason they're fraudulent is because you had certified annually that you were in compliance. What do you say about that? But all of that comes back to showing, to alleging with particularity that you weren't in compliance, which is to say that you were submitting claims to Fannie and Freddie based on foreclosure documents that were not according to compliance. So if he's going to say the certification was false, he has to allege what makes the certification false. And what would make the certification to Fannie or Freddie false is that you were submitting claims where you, J.P. Morgan, were fraudulently stamping the notes. So you need an example of that occurring in order to render the annual certification. So I know he wants to get away from the fact that he doesn't have a specific example of a fraudulent mortgage transaction that resulted in a submission to Fannie or Freddie. But even his new theory about saying the annual certifications are false still depend on that. Right, because the certification says all representations and warranties made by the servicer in the lender contract regarding the mortgages continue to be accurate and true in all respects. So your point is that to say that that certification is false, you would need to show or have particularized allegations that something was untrue in those mortgages being serviced. Right. You have to show that you weren't, in fact, in compliance. And you have to show it for a loan covered by that particular certification, which is why you need, going back to paragraph 67, there's a lot of high, you know, he doesn't actually have copies of those. And so he says they would have been filed each year before March. But you have to, you need the particulars of those annual certifications. You need to know which loans they covered, which time periods they covered, and what particular loan then occurred during that time period that was So you need an example to measure the certification inaccurate, and he doesn't have that. I see my time is up. Thank you, Mr. Martin. Mr. Davis. Yes. Yeah, Mr. Davis, when I think of the public disclosure board, I look at OSHERA and what these blog sites, I mean, I do have some concerns about grandma's Facebook page becoming the news media. But here are blogs that are set up to report about mortgage fraud in Miami, mortgage fraud involving Chase, JPMorgan. It's for public dissemination. Why doesn't the public disclosure board apply here? Let me answer the question this way, because I think everything the court has said appears to be an assumption. There is nothing in the record that shows that this blog was intended for public dissemination. We don't even know the name of this blogger. We don't know the purpose of this blog. For all we know, this could be, I don't know, an expert who is trying to get business from people who practice in this area. The question here is at the motion to dismiss stage, did JPMC establish that this anonymous blog met the things that Your Honor discussed? And I think on discovery, when the case is remanded, I'm fairly confident that's not how the evidence is going to pan out. But at least for now, Your Honor, the record, it's very clear. You don't know who this blogger is. You don't know the purpose of it. All you have is the status. The purpose, just from the face of the articles and the post itself, and the fact that it was publicly available and downloadable and filed in the record, why isn't that enough? For example, if this person, let's say if this person was an expert who was advertising to other foreclosure defense lawyers, that would not be the news media, right? That would not be an article that is intended for public dissemination. But I don't want to get too hooked on that. There's nothing to suggest here that these were subscription sites, were they? Is there? Well, Your Honor, I think that's the issue. This is their affirmative defense, and at the motion to dismiss stage, they never established that this was a subscription site, that this had any indicia of reliability as the news media. But I want to make sure that we don't get too lost in that because there is also... You're saying they did not submit anything that would establish that this was downloaded from publicly available websites intended to disseminate information? If we just take the formulation from Osherall, not what you want to put on it in terms of a more restrictive sense of what is news media. Forget that, okay? The broad sweep, the description from Osherall. You're telling me there's not enough in the record for them to have showed the district court, here it is, enough to where you have something to suggest it's not what it appears to be? Your Honor, I'll go back to the question that the court asked of JPMC during the court's questioning. What traffic does this website get? Who's writing it? Is this a site that... I'm not sure that matters under Osherall. The question I'm asking you is not about my questions to him earlier. It's about what Osherall says and what they submitted in the record and how it comports with what Osherall says. So the question is, would this be a website like Facebook? Yes. A publicly available website intended to disseminate information. I mean, that's what it just... They submitted more than enough to establish it's that. I don't want the court to get too hooked on this because there is the third element that is equally important, which is the question of material addition. I get that, okay. That is, I think that is... All right. Okay, Mr. Davis. Thank you. Thank you.